**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON and CERTAIN LONDON MARKET INSURANCE COMPANIES, | Civil Action No. 04-CV-1496 Hon. Joseph J. Farnan, Jr. |
| Appellants, | Appeal from Bankruptcy Case No. 02-10429 (Hon. Judith K. Fitzgerald) |
| v. | Consolidated with the appeal in *In re The Flintkote Co., et al.*, Bankr. Case Nos. 04-11300 & 04-12440 |
| BARON & BUDD, P.C., and SILBER PEARLMAN, LLP, | (Hon. Judith K. Fitzgerald) |
| Appellees. | D. Del. Case No. 04-CV-1521 |
| IN RE: | Chapter 11 |
| KAISER ALUMINUM CORP., *et al.* | Case Nos. 00-3837 – 3854 (JKF) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF DAVID A. KLINGLER

David A. Klingler declares as follows:

1.      "My name is David A. Klingler.  I am an attorney in good standing, having been licensed to practice law in Texas in 1989.  I am admitted to practice before the bars of the United States District Courts for the Northern, Eastern, and Southern Districts of Texas and the United States Courts of Appeals for the Third and the Fifth Circuits.  I am an attorney with Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, counsel for Baron & Budd, P.C., and Silber Pearlman, LLP, with respect from the so-called "2019 Order" issued in the underlying

1

*Flintkote* reorganization (Case No. 04-11300 referenced in the above caption).  The 2019 Order is electronically docketed as Docket Item ('D.I.') 337 therein.  I have personal knowledge of the matters set forth in this declaration, and such matters are true.

2.      "Attached hereto as Exhibit 1 is a true copy of the Affidavit of David J. Gordon in Support of First Day Motions, D.I. 2 in the *Flintkote* reorganization, as downloaded using the PACER system.

3.      "Attached hereto as Exhibit 2 is a true copy of the Affidavit of Kurt W. Melchior in Support of Application for an Order Authorizing the Debtor to Employ Nossaman Guthner Knox & Elliott LPP as Special Insurance Counsel in Matters Related to Pru-Re Pursuant to 11 U.S.C. § 327(e) and Disclosure of Compensation Pursuant to 11 U.S.C. § 329, which is included at D.I. 9 in the *Flintkote* reorganization.  This affidavit was downloaded using the PACER system.

4.      "Attached hereto as Exhibit 3 is a true copy of Baron & Budd, P.C.'s 2019 Statement, filed pursuant to the 2019 Order and appearing as D.I. 446 in the *Flintkote* reorganization.  It was downloaded using the PACER system.

5.      "Attached hereto as Exhibit 4 is a true copy of Silber Pearlman, LLC's 2019 Statement, filed pursuant to the 2019 Order and appearing as D.I. 602 in the *Flintkote* reorganization.  It was downloaded using the PACER system.

6.      "Attached hereto as Exhibit 5 is a true and correct copy of an order issued by the bankruptcy court in *In re Owens-Corning, et al.*, No. 00-3837 pending in the United States Bankruptcy Court for the District of Delaware, as downloaded using the PACER system.  The order in question is docketed as D.I. 14117 therein.

7.    "Attached hereto as Exhibit 6 is a true and correct copy of the opinion of the United States Court of Appeals for the Fourth Circuit in *White v. Univision of Va. Inc. (In re Urban Broad. Corp.)*, No. 04-1262, 2005 WL 563890 (4th Cir., Mar. 11, 2005). The attached opinion, as to which reported publication is pending, was downloaded using Westlaw.

8.    "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 5, 2005."

David A. Klingler

3

# Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY, | ) | Case No. 04-11300 (_____) |
| | ) | |
| Debtor. | ) | |

## AFFIDAVIT OF DAVID J. GORDON
## IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | ) ss.: |
| COUNTY OF SAN FRANCISCO | ) |

DAVID J. GORDON, being duly sworn, deposes and states:

1.      I am the President and Chief Executive Officer of The Flintkote Company (the "Debtor" or the "Company"). Previously, I served as the Debtor's Vice President and Assistant Secretary (from July 17, 2000 to August 5, 2002) and later as Senior Vice President and Secretary (from August 5, 2003 to December 31, 2003). In addition, I have served as a member of the Board of Directors of the Company since 2001. Based on my various roles with the Company, I am familiar with the Debtor's operations, business affairs and books and records.

2.      I submit this Affidavit in support of the "first day" motions and applications described further below (each, a "First Day Motion" or "Motion" and collectively, the "First Day Motions" or "Motions"). Except as otherwise indicated, all facts and statements set forth herein are based upon my personal experience and knowledge of the Debtor's operations and financial conditions, upon information supplied to me by other members of the Debtor's management, or upon my review of relevant documents. If I were called to testify, I

could and would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

       3.      Part I of this Affidavit describes the Debtor's business and the developments that led to the filing of this Chapter 11 Case. Part II sets forth the relevant facts in support of certain First Day Motions filed concurrently herewith, which the Debtor seeks to have heard as soon as possible after the commencement of this case. Part III sets forth the remaining First Day Motions filed concurrently herewith, which the Debtor does not seek to have heard at the "first day" hearing, but for which the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that an official creditors' committee appointed in this case may be heard with respect to such Motions. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the relevant First Day Motions.

## I.

## Background and Status of Debtor's Case

**B.**     **Overview**

       4.      The Debtor is currently a defendant in over 155,000 asbestos-related personal injury claims, asserted by plaintiffs seeking damages for personal injuries allegedly caused by exposure to asbestos-containing products manufactured or distributed by the Debtor. As discussed below, the Debtor stopped its manufacturing and distribution operations in the mid-1980's. Since then, the Debtor has focused its business primarily on two areas: (i) managing and resolving its asbestos-related and environmental liabilities and (ii) increasing the value of its assets through realization of insurance coverage through negotiation, litigation and prudent

investment of financial assets, all with the objective of maximizing assets available to satisfy

such liabilities. For the past 17 years, the Debtor has worked diligently to achieve these goals.

However, given the dramatic increase of asbestos-related personal injury claims being asserted

against the Debtor in recent years, and the impact of those claims on the Debtor's remaining

assets, it has become apparent that the Debtor cannot hope to fairly and equitably address both its

existing and future asbestos-related liabilities outside of bankruptcy.

5.    On May 1, 2004 (the "Petition Date"), the Debtor intends to file a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code")(the "Chapter 11 Case") in the United States Bankruptcy Court for the

District of Delaware (the "Bankruptcy Court").

6.    The Debtor's primary goal in filing this Chapter 11 Case is to confirm a

plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a

trust mechanism to address both current and future asbestos-related personal injury claims

against the Debtor and provide a means by which to realize upon the value of the Debtor's assets

for the benefit of such claimants, so that current asbestos claims and future demands that involve

similar claims are treated in a fair and equitable manner.

## C.    Background Concerning the Debtor's Business

7.    The Debtor, a Delaware corporation, traces its origin to the Flintkote

Manufacturing Company ("FMC"), which was founded in 1901. In 1912, the Debtor was

incorporated in Massachusetts as a separate company from FMC, and was later incorporated in

Delaware following a merger with another entity.

8.    From the time it commenced its independent operations in 1912 until around 1987, the Debtor was primarily engaged in the manufacture, processing and distribution of building materials. The materials were sold throughout the United States. As its mainstay product line, the Debtor manufactured roofing and insulation for use in commercial and residential construction. However, during the 1940's, the Debtor began to manufacture asphalt and plastic flooring materials. The Company later expanded its operations to the processing of limestone, aggregates, redi-mix concrete, cement, pre-fabricated chimneys, wallboard and water pipe. By the beginning of the 1980's, the Debtor's main business activities were grouped into four divisions:  Building Products (including roofing and insulation, gypsum, and flooring products), Cement Products, Lime Products and Stone Products. Certain of the products manufactured, processed or distributed by the Debtor contained asbestos.

9.    In the early-1980's, the Debtor stopped manufacturing and selling asbestos containing materials. The Debtor ceased all of its remaining operations by 1987, when it disposed of the Building, Cement, Lime and Stone products divisions to various third parties through the sale or other disposition of its remaining divisions and operations.

10.    Although it ceased its manufacturing, processing and distribution operations, the Debtor has remained active. Since 1987, the Debtor has been engaged in complex claim resolution, litigation and insurance activities related to paying liabilities arising from its prior operations. The Debtor has focused its efforts on managing its asbestos-related liabilities (by way of litigation defense or settlement) and maximizing the value of its assets. This has proven to be a substantial undertaking, particularly given the rapidly escalating volume of asbestos related claims in recent years.

11.    Since 1987, the Debtor has paid in excess of $630 million in the defense and settlement of over 350,000 asbestos-related and environmental claims. During that same time period, it has generated cash in excess of $670 million, resulting primarily from the collection of insurance receivables, commutations of insurance policies and settlements with insurers, and investment income. Most recently, for the twelve month period ending March 31, 2004, the Debtor paid approximately $150 million for defense and settlement of asbestos-related claims and generated insurance receipts and investment income of approximately $125 million.

12.    Despite the voluminous and complex nature of its business, the Debtor has effectively and efficiently operated using a handful of employees and outside professionals. In conjunction with the sale of its manufacturing and distribution operations in 1987, the Debtor decided to employ a small staff and rely upon a team of outside professionals and consultants to assist the Debtor in managing its liabilities (including its asbestos-related liabilities) and its assets. I believe that this approach has resulted in significant cost savings to the Debtor over time (by, among other things, reducing the Debtor's fixed costs for employee salaries and benefits and permitting the Debtor to retain the most highly qualified employees and professionals) and has avoided the duplication of efforts between the employees and outside professionals.

13.    The Debtor currently employs seven (7) salaried employees, each of whom plays a vital role in processing and resolving asbestos claims, collecting from insurers, realizing maximum insurance coverage and managing the Company's assets and liabilities. The Debtor also utilizes several outside professionals and consultants (each of whom has a long-standing relationship with the Company) to assist it in defending against the myriad of asbestos

claims and related lawsuits filed against it and litigating and negotiating with insurers. Among these professionals is the law firm of Frantz Ward LLP ("Frantz Ward"), which serves as the Debtor's primary outside counsel in connection with all asbestos personal injury litigation against the Debtor, and Nossaman Guthner Knox & Elliott LLP ("Nossaman Guthner"), which represents the Debtor in connection with the Pru-Re Litigation (as defined below) involving a material insurance coverage and collection dispute. The Debtor has filed separate applications to retain each of Frantz Ward and Nossaman Guthner as special counsel to the Debtor, as more particularly described below. These employees and professionals are critical to the Debtor's ability to confirm a plan of reorganization under §§ 524(g) and 1129 of the Bankruptcy Code and maximize the value of its assets during this Chapter 11 Case.

## D.    Description of Debtor's Financial Structure and Assets

14.    As of March 31, 2004, the Debtor's financial statements report assets of approximately $160 million and liabilities of approximately $70 million (which does not reflect contingent asbestos liability). The financial statements do not reflect the remaining aggregate policy limits available to pay asbestos-related personal injury claims, which total several hundred million dollars (which includes approximately $95 million arising from a settlement with an insurer which currently is held in trust). The liabilities set forth on the financial statement relate primarily to settlement installments payable and provisions for minimum asbestos claims costs. The Debtor is not a party to any secured financing arrangements, and it does not presently intend to secure debtor-in-possession financing in this Chapter 11 Case.

15.    The Debtor is the wholly-owned subsidiary of The Flintkote Trust (the "Trust"), which holds all of the stock of the Debtor in trust for the sole benefit of Long Beach

Memorial Medical Center. The Trust was established by the Debtor's former parent company, Genstar Pacific Company, on September 29, 2003. I am the sole trustee of the Trust.

16.     The Debtor's assets consist primarily of insurance assets, investments and cash on hand, stock in its wholly-owned Canadian subsidiary, Flintkote Mines Limited, and potential causes of action against third parties. The Debtor is the named insured under various policies covering all manner of liabilities, including, without limitation, liability for asbestos-related personal injury. Although the Debtor estimates that the remaining aggregate policy limits available to pay asbestos-related personal injury claims total several hundred million dollars, the Debtor's ability to realize upon the full value of such policies is subject to any number of factors, including, without limitation, the solvency of the insurers and the outcome of coverage disputes. Certain of the Debtor's insurers are subject to insolvency proceedings. The Debtor is actively pursuing claims against such insurers. Additionally, the Debtor is pressing what it believes are highly meritorious claims for substantial insurance coverage and collections against certain insurers including MMIC Litigation, which is described below.

17.     As further described below, the Debtor has approximately $43 million in cash and marketable securities as of the Petition Date, which are maintained, in part, in a general operating account with Wachovia Bank, National Association ("Wachovia") and a payroll account at Wells Fargo Bank, N.A. and is otherwise invested in overnight and short-term commercial paper managed by Wachovia and certain medium-term investment portfolios managed by Credit Suisse First Boston and Alliance Bernstein.

18.     Additionally, the Debtor owns all of the stock of Flintkote Mines Limited. Flintkote Mines Limited is a Canadian corporation located in Montreal, Quebec, Canada. It has

no operations but does manage assets consisting of various investments totaling approximately US $5 million (CAD $7 million). Asbestos personal injury claims have been asserted against Flintkote Mines Limited.

**E.    Description of Debtor's Liabilities**

19.    The Debtor's most significant liability is the numerous current claims, and projected future demands, of plaintiffs seeking damages for asbestos-related personal injury. The Debtor's other pre-petition liabilities are relatively small in amount. As of the Petition Date, the Debtor was current on its trade payables to vendors and the rent due to its landlord under its lease of office space in San Francisco. I believe that the aggregate amount of accrued trade payables as of the Petition Date is less than $75,000.

20.    The Debtor has been named on occasion as a defendant in certain actions filed by plaintiffs seeking damages for asbestos-related property damage and environmental liability purportedly caused by the Debtor's products or prior operations. As of May 1, 2004, however, there exist only three (3) asbestos-property damage lawsuits and two (2) environmental actions pending against the Debtor. Some of these actions have been pending for years, and all are in various stages of litigation. I believe there is adequate insurance for the disposition of known environmental and asbestos property damage claims.

**F.    Events Precipitating This Chapter 11 Filing**

21.    The Debtor has been forced to file for chapter 11 protection because of a growing number of asbestos-related lawsuits wherein the plaintiffs claim to have suffered personal injury due to asbestos-containing products manufactured, processed or sold by the Debtor. The first wave of asbestos-related lawsuits hit the Debtor in the mid-1970's. Since that

time, the number of claims (and the incremental cost to resolve such claims through settlement or litigation) has increased dramatically, with particularly large increases in the last five years. For example, in 1999, approximately 25,000 new claims were asserted against the Debtor. For the year ended December 31, 2003, approximately 44,000 new claims were asserted against the Debtor, representing an increase in claims of 76 % over 1999. In 1999, the Debtor paid approximately $57 million in asbestos personal injury claims and related defense costs. In 2003, the Debtor paid more than $127 million in claims and defense costs.

22.     The increase of litigation has been due to a number of factors, including the filing of chapter 11 petitions by numerous other parties alleged to be potentially responsible for the injuries suffered by asbestos plaintiffs. Many of these debtor parties are co-defendants with the Debtor in numerous lawsuits. The resulting stay of litigation against such parties has placed increased financial pressure on the Debtor, in the form of higher settlement demands from plaintiffs.

23.     The cost to defend against this litigation is overwhelming. For the twelve month period ending March 31, 2004, the Debtor spent approximately $12.5 million per month, on average, on primarily asbestos personal injury settlements and defense costs. Recently, recoveries from insurers have failed to keep up with such costs. The magnitude of this litigation has left the Debtor with no realistic alternative but to seek protection under chapter 11 of the Bankruptcy Code.

## II.

### First Day Motions and Applications

24.    I believe that a critical and necessary element of the Debtor's efforts at reorganization is the approval of the First Day Motions submitted concurrently herewith. The factual background and support for each of these first day pleadings is provided below.

### Case Administration

A.    **Motion Of The Debtor For An Order**
      **Approving Litigation Claimant Notice Procedures**

25.    By this motion, the Debtor seeks approval of a procedure for sending all notices, mailings and other communications related to this Chapter 11 Case to tens of thousands of asbestos-related personal injury claims ("Asbestos PI Claims") in care of their counsel of record at such counsel's address.

26.    To date, approximately 155,000 Asbestos PI Claims are pending against the Debtor. Such Claims have historically been processed by the Debtor's outside litigation counsel, the law firm of Frantz Ward, which maintains an extensive claims litigation database containing the names and addresses of the respective counsel for the Asbestos PI Claimants, rather than the names and addresses of each Asbestos PI Claimant. As a result, the Debtor has information only with respect to the counsel of record of each Asbestos PI Claimant. To date, all communication regarding the asbestos claims and the various pending lawsuits has been through and with such counsel of record. It would be a costly and a time-consuming exercise to attempt to ascertain the addresses of the Asbestos PI Claimants. Nor is it clear that the Debtor or Frantz Ward, in searching their respective files, would be able to identify current addresses for each of

the Asbestos PI Claimants. To provide notice to each Asbestos PI Claimant (as opposed to their counsel) could result in mass confusion on the part of such claimants, because the Debtor has never communicated directly with them in the past.

27.     The Debtor asks this Court to approve a procedure for sending all notices, mailings and other communications related to this Chapter 11 Case to the Asbestos PI Claimants in care of their counsel of record at such counsel's address (the "<u>Litigation Claimant Notice Procedures</u>"). The Litigation Claimant Notice Procedures will ease the Debtor's administrative burden of sending notices to the more than 155,000 Asbestos PI Claimants, thereby resulting in a more cost-efficient notice procedure and a direct benefit to the Debtor, its estate and creditors.

**B.    Application Of Debtor For An Order Under
28 U.S.C. § 156(C) Appointing Garden City Group, Inc.
As Notice, Claims and Balloting Agent For The Court**

28.     By this Application, the Debtor seeks to retain Garden City Group, Inc. ("<u>GCG</u>") as its notice, claims and balloting agent in this Chapter 11 Case. I have reviewed and been involved in the negotiation of the terms of GCG's engagement. A true and complete copy of the fully-executed engagement letter with GCG is attached as <u>Exhibit B</u> to the Application. I am advised that GCG is one of the country's leading noticing agents, with substantial expertise in the matters upon which it is to be engaged. I believe that the Debtor, its estate and creditors would benefit greatly from the services of GCG, given the large number of claims in this case.

## Business Operations

**C.    Motion Of Debtor For An Order Authorizing
Debtor To Pay Pre-Petition Salaries And Employee Benefits**

29.    Each of the Debtor's seven (7) salaried employees (collectively, the "Employees") plays a vital role in processing asbestos claims, collecting from insurers, and managing the Company's assets. These Employees perform a myriad of tasks in an economical and efficient manner, including, among others: managing the Debtor's financial investment portfolio; performing a variety of accounting functions (such as processing transactions, maintaining records, preparing financial statements, reports, forecasts and financial plans); reporting on and analyzing specialized insurance coverage projects; providing litigation support (including document review and production); and performing the Debtor's corporate and administrative functions. In addition, members of the Senior Management, in particular, play a key role in negotiating with the Debtor's various insurers over coverage issues and pursuing coverage disputes (such as in the Pru-Re Litigation, described herein). The long-term, institutional knowledge and company specific skills of the Employees with respect to these and other tasks is critical to the Debtor's ability to successfully navigate this Chapter 11 Case.

30.    By this motion, the Debtor seeks an order authorizing, but not requiring, the Debtor to pay and honor its pre-petition obligations with respect to the Employee Salaries, Reimbursable Business Expenses and the Employee Benefit Programs (together, the "Employee Salaries and Benefits"). I believe that it is essential for the Debtor to honor and pay any pre-petition Employee Salaries and Benefits in the ordinary course of business, in order to maintain Employee morale and each Employee's continued dedication to the significant task at hand and

-12-

to avoid the disruption of service. Without these Employees, I believe the Debtor cannot successfully accomplish its goal of maximizing the value of its assets for the benefit of its creditors and confirming a plan of reorganization in this Chapter 11 Case.

      (i)    Employee Salaries and Reimbursable Business Expenses

      31.    The Employees are paid twice a month from the Debtor's payroll account (the "Payroll Account") at Wells Fargo Bank ("Wells Fargo"). The total semi-monthly payroll is approximately $40,000. Prior to the Petition Date, the Employees were paid their respective salaries earned through April 30, 2004 through direct deposit. Given that the bankruptcy petition was filed the very next day, I do not believe that the Debtor owes any pre-petition Employee Salaries.

      32.    Furthermore, some of the Employees incur travel and transportation expenses which are reimbursable per Company policy (the "Reimbursable Business Expenses"). These Reimbursable Business Expenses typically are paid by the Debtor on a rolling basis as processed. As of the Petition Date, I believe that less than $10,000 was owed on account of Reimbursable Business Expenses.

      (ii)    Payroll Tax Withholdings

      33.    In the ordinary course of its business, the Debtor instructs Wells Fargo, as the administrator of the Payroll Account, to withhold and remit certain payroll taxes (such as income, FICA and Medicare taxes) from the Employees' paychecks to the appropriate taxing authorities.

(iii)    Vacation, Sick Leave and Other Paid Time Off

34.    The Debtor provides its Employees with benefits under various Employee Benefit Programs. Among other benefits, the Employees accrue paid vacation leave on a semi-monthly basis and are permitted to take paid vacation each year. The Employees must use all of their accrued vacation in the year in which it accrues, or lose it. Thus, the Employees may have accrued vacation from January 1, 2004 through the Petition Date. In addition to vacation, the Employees are entitled to certain holiday pay, sick leave pay for six (6) days per year, and one (1) floating holiday/personal day.

(iv)    Retirement Benefit Plans

35.    Depending upon their respective salary structure, certain Employees are eligible to participate in either (i) a 401(k) profit sharing plan (the "401(k) Plan") or (ii) an alternative retirement program (the "Alternative Program," together with the 401(k) Plan, the "Retirement Benefit Plans"). I do not believe that the Debtor owes any contributions or amounts under the Retirement Benefit Plans as of the Petition Date.

(v)    Workers' Compensation

36.    The Debtor maintains a workers' compensation policy to cover Employees' injury claims arising from or relating to their respective employment with the Debtor. The policy coverage is not subject to a per occurrence deductible. The Debtor is not aware of any outstanding claims under the workers' compensation policy as of the Petition Date.

(vi)    Medical and Insurance Benefits

37.    The Debtor offers to its Employees various medical, life, accidental death and dismemberment, and long-term disability insurance coverage (the "Group Plan"). The

Debtor pays all premiums for the Group Plan in advance, on a quarterly basis. Additionally, the Debtor also pays the premiums on separate medical and life coverage for certain Employees not otherwise eligible for the Group Plan. I believe that all pre-petition premiums due under these Plans were paid as of the Petition Date.

**D.    Motion Of Debtor For An Order (A) Authorizing Use Of Pre-Petition Accounts and Cash Management System and (B) Waiving Requirements of 11 U.S.C. § 345 On An Interim and Final Basis**

38.    By this motion, the Debtor seeks (i) authority to maintain and use its Pre-Petition Account and existing Cash Management System and (ii) a waiver of the investment and deposit guidelines set forth in § 345(b) of the Bankruptcy Code on an interim and final basis. For the reasons described below, I believe that granting the relief requested in the motion is in the best interest of the Debtor, its estate and creditors.

(i)    Description of the Cash Management System

39.    The Cash Management System (or the "System") provides the Debtor with the ability to control receipts and disbursements to ensure maximum availability of funds, to reduce the costs and administrative expenses inherent in moving and tracking such funds and to earn income on funds not immediately necessary to meet the Debtor's obligations. The Debtor is accustomed to using the Cash Management System on a daily basis. Continuing the Cash Management System will ease the administrative burdens imposed on the Debtor and will result in greater efficiency for the benefit of the estate.

40.    The System consists of two bank accounts: an operating account at Wachovia Bank (the "Operating Account") and the Payroll Account at Wells Fargo (collectively, the "Pre-Petition Accounts" or "Accounts"). These Accounts are integrally tied to the Debtor's

investment practices, which consists primarily of three separate investment portfolios (the "Investment Portfolios").

      41.    Any funds received by the Debtor, including funds received from insurers, are deposited into the operating account at Wachovia Bank . The deposited funds are used (i) to pay the Debtor's current operating expenses, as well other liabilities of the Debtor, such as payroll and professional fees and (ii) to make investment purchases, as described below. Prior to the Petition Date, the Debtor also paid asbestos-related settlements from funds held in the Operating Account.

      42.    Once a month, the Debtor transfers funds from the Operating Account to the Payroll Account in an amount sufficient to fund approximately three pay periods. Disbursements from the Payroll Account are made by direct deposit into each Employee's bank account. Wells Fargo automatically withholds taxes and Employee-specified 401(k) contributions, as well as any other amounts as directed by the Employees or the Debtor. Wells Fargo remits such withheld funds to the appropriate taxing authorities and forwards Employee contributions along with the Debtor's matching contribution to its 401(k) manager, Fidelity Investments.

      43.    The Debtor proposes to keep in place all Pre-Petition Accounts, which would remain open, but would be designated as "Debtor-in-Possession" accounts. The Debtor will work closely with Wachovia and Wells Fargo to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. Going forward, the Debtor will maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be

documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date. Finally, to minimize expenses, the Debtor requests that it be authorized to continue to use all remaining checks and other business forms without reference to the Debtor's status as debtor in possession, until the same are exhausted.

       (ii)     Description of Investment Practices

       44.     In addition to maintaining the Cash Management System, I believe that it is in the best interest of the Debtor's estate and creditors that the Court waive the strictures of § 345(b) of the Bankruptcy Code. The Debtor maintains predictable investments with financial institutions with Moody's Rating of "A1" or better and employs a careful strategy for investing its assets. True and complete copies of the investment guidelines for each of the CSAM Portfolio and the Alliance Bernstein Portfolio (as such terms are defined below) are attached as Exhibit B and Exhibit C, respectively, to the motion. This investment program has yielded significant returns for the Debtor to date. The Debtor does not believe that liquidating its investments in order to comply with § 345(b) of the Bankruptcy Code will provide more certainty or a greater return on its investment. The Debtor therefore requests that the Court waive the requirement of § 345(b).

       45.     At the end of each business day, Wachovia, by and through Wachovia Capital Management ("WCM"), automatically invests funds from the Operating Account in excess of $70,000, in Wachovia commercial paper that matures the following business day (the "Sweep Investment"). As of the Petition Date, approximately $7 million of operating funds were invested in the Sweep Investment. To the extent that funds in the Sweep Investment exceed anticipated near term cash requirements, the Debtor invests such funds in the Short-Term

Investment Portfolio managed by WCM, which has authority to invest in commercial paper, bankers' acceptances and certificates of deposit with terms up to 180 days.

46.    Based on its liquidity needs, the Debtor also allocates certain funds in the Operating Account to the Investment Portfolios managed by Credit Suisse Asset Management ("CSAM") and Alliance Bernstein.  As of the Petition Date, the CSAM Portfolio contained securities with a market value of approximately $27 million, and the Alliance Bernstein Portfolio contained securities with a market value of approximately $9 million.  The investment guidelines followed by each of CSAM and Alliance Bernstein are described in detail in the cash management motion.  Both of the Debtor's investment portfolios have overall investment grade credit ratings.  I believe that WCM, CSAM and Alliance Bernstein and are well-regarded investing institutions that will continue to maintain prudent investment decisions throughout this Chapter 11 Case.

## III.

## Other First Day Motions

47.    Described below are the remaining First Day Motions filed concurrently herewith.  The Debtor does not seek to have these remaining First Day Motions heard at the "first day" hearing.  Rather, the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that the official creditors' committee appointed in this case may be heard with respect to such Motions.

## Employee Retention and Severance

**A.    Debtor's Motion For Order Pursuant To 11 U.S.C. §§ 363 And 365(a) Authorizing (1) Implementation Of Retention And Severance Program; (2) Assumption Of Employment Agreements With Senior Management; And (3) Assumption Of Indemnification Agreement With Outside Director**

48.    The Debtor seeks authority of this Court to implement a Retention and Severance Program for its Employees and to assume the pre-petition Employment Agreements between the Debtor and its senior management and the pre-petition Indemnification Agreement with Jack West (the only non-employee member of the Debtor's Board of Directors).

(i)    Implementation of the Retention and Severance Program

49.    For the past 17 years, the Debtor and its Employees have focused their efforts primarily on managing and resolving the Company's considerable asbestos-related liabilities and increasing the value of its assets. The Employees understand that the Debtor intends to confirm a plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a trust mechanism to process and pay asbestos-related personal injury claims and provide a means to realize upon the value of the Debtor's assets. Although it is possible that the Trust may want the Debtor and its existing Employees to assist in its administration of the Trust assets and asbestos claims, the Employees are aware that they may lose their jobs after the plan is confirmed and the trust is established. The Retention and Severance Program outlined in the motion is intended to provide some measure of security and certainty to these Employees so that they will continue to provide their services to the Debtor during this Chapter 11 Case. I believe that the Retention and Severance Program will accomplish that goal and thereby will benefit the Debtor and its estate and creditors.

50.     The bankruptcy filing has created concerns among the Debtor's Employees regarding their future employment prospects. The Employees (including the members of Senior Management) are foregoing other employment opportunities by continuing to work for the Debtor. Also, many, if not all, of the Employees have undertaken significant additional duties in order to comply with the operating guidelines and disclosure requirements of the Bankruptcy Code and Rules.

51.     Historically, the Debtor has paid annual bonuses to its employees, with the amount of such bonuses fixed by the Board of Directors in its discretion. For example, in years past, the Board has tied the bonuses to the Debtor's performance in reducing payments to claimants or increasing its asset base through investment management, commutations of policies and settlements with insurers. However, because of the nature of the Debtor's operations post-petition, it is difficult to base the amount of such bonuses on any meaningful and objective financial targets. As a part of its bankruptcy, I believe that it is appropriate for the Debtor to discontinue its practice of paying "discretionary" bonuses at year end and instead implement a retention program aimed at encouraging the Employees to stay through the effective date of a plan of reorganization.

52.     In addition to the annual bonus, the Debtor offered a modified severance policy to its Employees prior to the Petition Date. The Debtor wishes to continue to offer this reduced severance to its Employees in the amount set forth in the motion. Historically, the amount of the pre-petition severance varied for each Employee, but it was primarily based upon the Employee's position within the Company and/or years of service. In contemplation of this Chapter 11 Case, the Debtor has reduced the amount of the severance being offered to each

Employee from the historical levels and built that reduction into the proposed retention payments for each Employee. I believe that the proposed retention payments, together with a reduced post-petition severance, will more effectively encourage the Employees to stay with the Company through this Chapter 11 Case, than would the prospect of a larger, one-time severance payment. Although the Employees understand that the proposed Retention and Severance Program is subject to Court approval, I believe that this program already has enhanced Employee morale and staved off, at least temporarily, the Employees from pursuing other job opportunities. I am concerned that the Employees will seek other jobs if the proposed Retention and Severance Program is not approved.

53.    With respect to the Senior Management, the proposed retention payments and severance (as set forth in the motion) is the product of arms' length negotiation between the Debtor and each member of the Senior Management. Eric Bower has signed an affidavit, which is filed concurrently herewith, stating that my proposed retention payments and severance is the product of arms' length negotiation between the Debtor and me. For the other Employees, the Debtor fixed the proposed retention and severance payments based upon their years of service and position within the Company.

54.    Based upon my review of the analysis performed by AON Corporation with respect to the proposed compensation (including retention and severance) for the Senior Management, and my personal business experience, I believe the terms of the proposed Retention and Severance Program are comparable to the incentive programs offered by comparable insurance companies and claim paying organizations.

(ii)    Assumption of Employment Agreements and Indemnification Agreement

55.    The Debtor also seeks to assume the pre-petition Employment Agreements between the Debtor and its Senior Management and the Indemnification Agreement with Director Jack West.  These Agreements are the product of arms' length negotiation between the Debtor and each member of the Senior Management.  The Board of Directors has reviewed and approved the terms and conditions of the Employment Agreements pursuant to a vote of the applicable disinterested Directors.  The Board of Directors also has reviewed and approved the terms of the Indemnification Agreement.  A true and complete copy of each Employment Agreement and the Indemnification Agreement is attached as Exhibits D through G, respectively, to the motion.

56.    I believe that the terms of each of the Employment Agreements and the Indemnification Agreement are fair and reasonable and will benefit the Debtor and its estate by allowing the Debtor to retain its Senior Management and maintain the current composition of its Board of Directors.  Under the terms of the Employment Agreements and the Indemnification Agreement, the Debtor has agreed to indemnify its Senior Management and Directors, as applicable, for their post-petition conduct.

## Professional Retention and Compensation

**A.    Motion Of Debtor For An Order Authorizing
The Appointment Of A Futures Representative**

57.    The Debtor seeks authority to appoint a Futures Representative to represent the interests of Future Claimants in this Chapter 11 Case.  As part of this Chapter 11 Case, the Debtor hopes to confirm a plan of reorganization establishing a trust under § 524(g) of

the Bankruptcy Code, in order to deal with its current and future asbestos liability. Although the

Debtor expects to negotiate the terms of such plan with the major constituencies in this case,

including any official committee of creditors, the Debtor proposes that the interest of future

asbestos claimants (who do not presently have claims pending) be represented by a Futures

Representative.

58.    One of the key elements of any plan of reorganization proposed by the

Debtor in this case will be a establishing a trust pursuant to which all current and future

asbestos-related claims involving the Debtor will be channeled for liquidation and payment.

Statistically speaking, I believe that future claims represent a greater portion of the Debtor's

ultimate asbestos liability than do current claims. In order to best protect the interests of Future

Claimants with respect to their asbestos-related Demands, a Futures Representative should be

appointed.

59.    I believe that appointing a Futures Representative at the outset of this

Chapter 11 Case will facilitate the negotiations between the various constituencies over the terms

of a plan of reorganization and result in a more efficient process. The Debtor has considered the

qualifications of various candidates, and has decided to recommend Lawrence Fitzpatrick to the

Court as the most qualified candidate for Futures Representative. The Debtor has agreed to

provide Lawrence Fitzpatrick with the Futures Representative's Liability Insurance to provide

him with insurance coverage effective as of the date of his appointment as the Futures

Representative. The Debtor has been advised by counsel to Lawrence Fitzpatrick that the

Futures Representative's Liability Insurance has an annual premium of approximately $25,000,

which amount the Debtor has agreed to pay. I believe that appointing Lawrence Fitzpatrick as

the Futures Representative is in the best interest of the Debtor, its estate and creditors.

**B.      Application Of Debtor For An Order Authorizing
The Retention Of Sidley Austin Brown & Wood LLP
As Attorneys For The Debtor And Debtor In Possession**

60.     This Chapter 11 Case will be complex, particularly given the nature and

extent of the Debtor's asbestos-related liabilities and its insurance assets. The Debtor has chosen

Sidley Austin Brown & Wood LLP ("Sidley") as its bankruptcy counsel for this case because of

Sidley's extensive experience and knowledge in business reorganizations, in general, and in mass

tort and asbestos-related bankruptcies, in particular.

61.     The partners and associates of Sidley who will advise the Debtor in this

case have wide-ranging experience in insolvency and bankruptcy law, as well as in litigation and

corporate law. I understand that Sidley serves as counsel to other companies in complex chapter

11 cases and, in those representations, the firm has advised those companies on many of the

same or similar issues confronting the Debtor in this case. For all of the foregoing reasons, I

believe that Sidley is well-qualified to represent the Debtor as debtor in possession in this

Chapter 11 Case.

**C.      Application Of Debtor For An Order Authorizing The Retention And
Employment Of Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
As Attorneys For The Debtor And Debtor In Possession**

62.     The Debtor seeks to retain the firm of Pachulski Stang Ziehl Young Jones

& Weintraub, P.C. ("Pachulski Stang") as Delaware bankruptcy co-counsel to the Debtor.

Pachulski Stang will serve primarily as local counsel, but it has the capability to provide full

representation to the Debtor, as may be required from time to time in the event of potential

conflicts. Given its proximity to the Court, Pachulski Stang will be able to respond quickly to

emergency hearings and other emergency matters in this Court.

63.     I believe that Pachulski Stang's appearance before this Court for the

miscellaneous applications, motions and matters in this Chapter 11 Case will be efficient and

cost-effective for the Debtor's estate. Sidley and Pachulski Stang will endeavor to avoid

duplication of efforts. In preparing for this case, Pachulski Stang has become familiar with the

Debtor's business and with many of the potential legal issues that may arise in the context of this

Chapter 11 Case. Accordingly, I believe that Pachulski Stang is both well-qualified and able to

represent the Debtor in its Chapter 11 Case.

**D.    Application Of Debtor For An Order Authorizing
        The Debtor To Employ Frantz Ward As Special Asbestos
        Litigation Counsel Pursuant To 11 U.S.C. § 327(e)**

64.     The Debtor requests authority to employ and retain Frantz Ward as special

asbestos litigation counsel to the Debtor. The Debtor seeks to retain Frantz Ward as its special

counsel because of the long-standing familiarity of Barbara Arison and Patrick Haggerty, both

Frantz Ward partners, with the business and asbestos-related liabilities of the Debtor, as well as

Frantz Ward's extensive experience in the field of asbestos litigation defense.

65.     I believe that Ms. Arison and her colleagues are intimately familiar with

the Debtor's business affairs, including its alleged asbestos-related personal injury liabilities.

Moreover, Frantz Ward maintains an extensive database of all asbestos-related personal injury

claims that have been asserted against the Debtor (including pending and settled claims). I

believe that Ms. Arison's knowledge of these liabilities and this database is critical to the Debtor

being able to determine the extent of its current and future asbestos liability. For these reasons, I

believe that it is necessary and in the best interests of its estate and creditors to employ and retain

Frantz Ward as its special asbestos litigation counsel in connection with this Chapter 11 Case.

**E.    Application Of Debtor For An Order**
**Authorizing The Debtor To Employ Nossaman**
**Guthner Knox & Elliott LLP As Special Insurance Counsel**
**In Matters Related To Pru-Re Pursuant To 11 U.S.C. § 327(e)**

66.    The Debtor seeks to employ and retain Nossaman Guthner as its special

insurance counsel in matters related to the Pru-Re Litigation. Nossaman represents the Debtor

with respect to its claims for substantial insurance coverage under several primary policies

written by Everest Reinsurance Company, formerly known as Prudential Reinsurance Company,

and Mt. McKinley Insurance Company, formerly known as Gibralter Casualty Company,

(collectively referred to as, "MMIC") and issued to the Debtor at various times from 1975

through 1980. MMIC currently owes the Debtor in excess of $25 million for unpaid insurance

claims, which MMIC disputes. In May 2002, MMIC filed an action for declaratory relief in San

Francisco Superior Court and the Debtor answered and counter-claimed (the "Pru-Re

Litigation"). Extensive discovery has occurred and several court days of the first phase of the

trial have been completed. The potential recovery from the Pru-Re Litigation represents a

significant asset of the Debtor's estate.

67.    I believe that Nossaman's continued representation of the Debtor in

connection with the Pru-Re Litigation and will provide a substantial benefit to the Debtor, its

estate and creditors. Nossaman is well-qualified to represent the Debtor as its special insurance

counsel with respect to the Pru-Re Litigation and related matters.

**F.    Motion Of Debtor For An Order Under**
**11 U.S.C. §§105(a) and 331 Establishing Procedures for**
<u>**Interim Compensation and Reimbursement of Expenses for Professionals**</u>

68.    The Debtor requests that the Court establish procedures for compensating and reimbursing Court-approved, professionals on a monthly basis. Such procedures will streamline the professional compensation process and enable the Court, the Debtor and all other parties to more effectively monitor the professional fees incurred in this Chapter 11 Case. I believe that an order establishing interim compensation procedures is in the best interest of the Debtor and its estate and creditors.

**G.    Motion Of Debtor For An Order Authorizing The**
**Debtor To Employ And Compensate Certain Professionals**
<u>**For Services Rendered In The Ordinary Course Of Business**</u>

69.    Prior to the Petition Date, the Debtor employed, from time to time, various consultants, attorneys and/or law firms and other professionals in the ordinary course of its business (the "<u>Ordinary Course Professionals</u>"). The Debtor wants to continue to retain certain of these professionals post-petition. The Debtor seeks to retain the Ordinary Course Professionals identified in <u>Exhibit A</u> to the motion. Notably, these Ordinary Court Professionals were culled out from a much larger group of outside professionals who formerly provided services to the Debtor. The Debtor recognizes that each of the Ordinary Course Professionals provides specialized services and unique experience and knowledge of the Debtor's assets and liabilities that are necessary to the Debtor's operations and its ultimate success in this Chapter 11 Case. Because each of these Ordinary Course Professionals has worked with the Debtor for years, each has obtained a particular level of expertise and knowledge of the Debtor and its liabilities and assets (including its insurance assets) that cannot be easily replaced.

70.     The Debtor desires to continue to retain the Ordinary Course Professionals to render services to the estate similar to those services rendered prior to the Petition Date. Given the limited scope of the services provided by each Ordinary Course Professional, and the relatively small amount of fees paid to each Professional on a monthly basis, I believe it would be inefficient to submit an individual application and proposed retention order to the Court for each such Ordinary Course Professional. Retaining the Ordinary Course Professionals in this manner will result in savings to the Debtor and its estate, by avoiding the need to file monthly fee applications and the associated preparation costs charged to the estate and providing a stream-lined procedure for compensating such Professionals each month. The uninterrupted services of the Ordinary Course Professionals are vital to the Debtor's continuing operations and its ultimate ability to reorganize. For these reasons, I submit that approval of relief requested in the motion is in the best interest of the Debtors and its estate and creditors.

## IV.

### Conclusion

71.     Based upon my personal knowledge, and my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the Debtor to continue to operate effectively as a debtor in possession following the filing of this Chapter 11 Case. For all the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of April, 2004.

_____
David J. Gordon
President and Chief Executive Officer
The Flinkote Company

SWORN to and subscribed before
me this 28 day of April, 2004

_____
Notary Public

My Commission Expires: April 1, 2007
          (SEAL)

> LEANDRA DIXON
> COMM. #1408685
> NOTARY PUBLIC - CALIFORNIA
> LOS ANGELES COUNTY
> My Comm. Exp. April 1, 2007

Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE FLINTKOTE COMPANY,<br><br>Debtor. | Chapter 11<br><br>Case No. 04-11300 (_____) |

**AFFIDAVIT OF KURT W. MELCHIOR IN SUPPORT OF APPLICATION
FOR AN ORDER AUTHORIZING THE DEBTOR TO EMPLOY
NOSSAMAN GUTHNER KNOX & ELLIOTT LLP AS SPECIAL INSURANCE
COUNSEL IN MATTERS RELATED TO PRU-RE PURSUANT TO 11 U.S.C. § 327(e)
AND <u>DISCLOSURE OF COMPENSATION PURSUANT TO 11 U.S.C. § 329</u>**

STATE OF CALIFORNIA      )
                              )    ss.:
COUNTY OF SAN FRANCISCO  )

KURT W. MELCHIOR declares as follows:

1.      I am a partner in the firm of Nossaman Guthner Knox & Elliott LLP ("<u>Nossaman</u>"). Nossaman maintains five offices, including offices at 50 California Street, 34th Floor, San Francisco, California 94111-4707; and 445 South Figeroa Street, 31st Floor, Los Angeles, California 90071-7800. I am duly authorized to submit this affidavit on behalf of Nossaman. I submit this affidavit in support of the application of The Flintkote Company ("<u>Flintkote</u>" or the "<u>Debtor</u>") to retain Nossaman as its special insurance counsel in matters related to the Pru-Re Litigation, as defined below, as is set forth more fully herein.

2.      Nossaman represents the Debtor with respect to its claims for substantial insurance coverage under several excess policies written by Everest Reinsurance Company, formerly known as Prudential Reinsurance Company, and Mt. McKinley Insurance Company,

formerly known as Gibraltar Casualty Company, (collectively referred to as "Mt. McKinley Insurance Companies" or "MMIC") and issued to the Debtor at various times from 1975 through 1980. In particular, on or about January 23, 1991, MMIC entered into an agreement with the Debtor that (a) set forth the terms and conditions upon which MMIC would perform its preexisting obligation to provide insurance coverage for the Debtor's asbestos-related bodily injury claims, and (b) settled the related coverage litigation between MMIC and the Debtor. On or about July 9, 2001, and monthly thereafter, the Debtor has presented claims to MMIC for payment pursuant to the terms of the settlement agreement. MMIC has failed and refused to pay such claims. The Debtor's unpaid billings to MMIC currently exceed $20 million. In May 2002, MMIC filed an action for declaratory relief in San Francisco Superior Court and the Debtor answered and counter-claimed, seeking compensatory and punitive damages, prejudgment interest and attorney's fees (the "Pru-Re Litigation"). Extensive discovery has occurred and a number of court days of the first phase of the trial have been completed. Other court sessions have been scheduled. The potential recovery from the Pru-Re Litigation represents a significant asset of the Debtor's estate.

3.     For the past two years, Nossaman, principally through its partners Kurt W. Melchior and Alison S. Hightower, has represented the Debtor in prosecuting its coverage claims in the Pru-Re Litigation. Further, Kurt Melchior and Alison Hightower, and their colleagues at Nossaman, have represented the Debtor in prosecuting its coverage claims against over twenty other insurers over the past 15 years. In connection with such representations, they have become uniquely and thoroughly familiar with the Debtor's affairs, asbestos liability exposure, and its related insurance rights in matters related to MMIC. Nossaman also is the repository of

significant data bases and records relating to the Debtor's insurance coverage with MMIC and all of its other insurers.

4.    In connection with the representation of the Debtor as its special insurance counsel in matters related to the Pru-Re Litigation, it is anticipated that Nossaman will provide the Debtor with the legal and litigation support required by the Debtor, including, without limitation, advising and representing the Debtor with respect to the following matters:

(a)    advising the Debtor with respect to its rights to various insurance coverage;

(b)    taking all necessary action to protect such rights to insurance coverage and to maximize the Debtor's insurance recoveries from the Pru-Re Litigation;

(c)    negotiating with other parties to the Pru-Re Litigation to secure recoveries for asbestos liabilities through settlement;

(d)    litigating coverage disputes through alternative dispute resolution mechanisms and in federal and state courts;

(e)    representing the Debtor at hearings to be held before this Court and communicating with the Debtor regarding issues related to the Pru-Re Litigation that may be raised or heard before this Court, as well as the decisions and considerations of this Court on matters related to the Pru-Re Litigation;

(f)    assisting the Debtor in preparing appropriate legal pleadings and proposed orders as may be required in support of positions taken by the Debtor in matters related to the Pru-Re Litigation, as well as preparing witnesses and reviewing documents relevant thereto;

(g)    assisting in the development of a plan of reorganization, including advising the Debtor with respect to any claims handling trusts and issues relating to the Pru-Re Litigation;

(h)    taking all other necessary actions to preserve and maximize the value of the Debtor's estate in matters related to the Pru-Re Litigation; and

(i)    rendering such other services as may be in the best interests of the Debtor in connection with any of the foregoing, as agreed upon by Nossaman and the Debtor.

5.    To the best of my knowledge and information, neither I, Nossaman, nor any partner, counsel or associate of Nossaman, as far as I have been able to ascertain, represents or holds any interests adverse to the Debtor or the Debtor's estate in matters upon which Nossaman is to be employed. Accordingly, Nossaman's retention pursuant to 11 U.S.C. § 327(e) is appropriate.

6.    Nossaman in the past has represented, currently represents, or may in the future represent, certain creditors or claimants of the Debtor and other parties in interest, or their respective attorneys, accountants and investment banks in matters wholly unrelated to the Debtor, the Debtor's chapter 11 cases, or those entities' claims against or interests in the Debtor.

7.    Nossaman has conducted a series of searches of its databases to identify relationships with creditors and other parties in interest (or potential parties in interest) with respect to the Debtor. Specifically, Nossaman has searched its database to identify, during the last five years, (i) circumstances in which Nossaman has represented clients other than the Debtor on matters involving the Debtor, (ii) matters in which Nossaman is engaged in asbestos-related litigation, (iii) representations by Nossaman of or adverse to the Debtor's 20 largest unsecured creditors, as set forth in its petition, (iv) representations by Nossaman of or adverse to insurers to the Debtor, (v) representations by Nossaman of or adverse to the Debtor's shareholder, The Flintkote Trust and its sole beneficiary, Long Beach Memorial Medical Center, (vi) representations by Nossaman of or adverse to the Debtor's only subsidiary Flintkote Mines, (vii) representations by Nossaman of or adverse to certain former affiliates of the Debtor; (viii) representations by Nossaman of or adverse to the Debtor's directors and officers, and (ix) Nossaman's relationships with other professionals retained by the Debtor. Exhibit A lists all of the entities that were reviewed for potential connections with Nossaman. The charts set forth on

Exhibit B summarize the results of the foregoing searches.    Except for the representations disclosed on Exhibit B, Nossaman (a) does not hold or represent any interest adverse to the Debtor's estate in matters upon which Nossaman is to be engaged, and (b) is disinterested.

8.    As part of its practice, Nossaman appears in numerous cases, proceedings and transactions involving many different professionals and other attorneys, accountants and financial consultants, some of which may represent claimants and parties in interest in the Debtor's chapter 11 case.  Furthermore, Nossaman has in the past and will likely in the future be working with or against other professionals involved in this chapter 11 case in matters unrelated to this chapter 11 case.  Based on my current knowledge of the professionals involved, and to the best of my knowledge, none of these business relationships represent interests materially adverse to the Debtor herein in matters upon which Nossaman is to be engaged.

9.    To the best of my knowledge, Nossaman has no connection with the United States Trustee or any person employed by the office of the United States Trustee.

10.    To the extent that I become aware of any additional relationship that may be relevant to Nossaman's representation of the Debtor, I will promptly file a supplemental Affidavit.

## DISCLOSURE OF COMPENSATION

11.    Nossaman has been paid for all services rendered and expenses incurred before the Petition Date.  Nossaman has received a retainer of $70,000.00 in connection with its representation of the Debtor up until the petition date.  To the extent that retainer is not fully spent as of the Petition Date, that retainer shall be held in the Firm's general trust account, against which Nossaman can charge any unpaid fees and expenses at the end of the engagement.

In addition to the retainer, during 2004 to date, Nossaman has received $478,438.76 for legal services rendered and expenses incurred on behalf of the Debtor. Other than the amounts disclosed herein, Nossaman has received no other sums from the Debtor in 2004 prior to the Petition Date.

12.    Nossaman intends to apply to the bankruptcy court for compensation for professional services rendered in connection with the Debtor's case in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, the fee guidelines of the United States Trustee and the Orders of this Court. Nossaman will seek compensation for the services of each attorney and para-professional acting on behalf of the Debtor in the matters in which Nossaman is retained at its then-current ordinary and standard hourly rates charged for such services in comparable matters.

13.    Nossaman's billing rates currently range from $215 to $475 per hour for attorneys, and from $100 to $145 per hour for para-professionals. These hourly rates are subject to periodic increases in the normal course of Nossaman's business.

14.    The hourly rates set forth above are Nossaman's ordinary and standard hourly rates for the services expected to be rendered in this case by the persons engaged herein. These rates are set at a level designed to compensate Nossaman fairly for the work of its attorneys and legal assistants. It is Nossaman's policy to charge its clients for all other services provided and for disbursements and expenses incurred in the rendition of services. These disbursements and expenses include, among other things, costs for telephone and telecopier toll and other charges, mail and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, expenses for "working meals," computerized

research, transcription costs, and witness fees and other fees related to trials and hearings, as well as non-ordinary overhead expenses such as secretarial overtime.

     15.    Nossaman has no agreement with any other entity to share any compensation received in connection with these cases, nor will any be made, except as permitted under 11 U.S.C. § 504(b)(l).

     I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of April, 2004.



                       Kurt W. Melchior

Sworn and subscribed to before
me this 26th day of April 2004

_____
Notary Public

   (SEAL)

BARBARA A. SMITH
Commission # 1293310
Notary Public - California
San Francisco County
My Comm. Expires Feb 5, 2005

Exhibit 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| The Flintkote Company, | § | CASE NO. 04-11300-JKF |
| | § | (CHAPTER 11) |
| DEBTOR. | § | |

## AMENDED VERIFIED STATEMENT
## OF BARON & BUDD, P.C. UNDER BANKRUPTCY RULE 2019

I, Alan B. Rich, a representative of Baron & Budd, P.C., declare as follows:

1.      I am a shareholder of the law firm of Baron & Budd P.C. (hereinafter the "Firm").

I am a  member in good standing of the bar of the state of Texas.

2.      I have personal knowledge of the facts set forth herein.  I make this Verified

Statement ("Statement") pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure and

the Court's Order of October 22, 2004.

3.      The Firm is a professional corporation organized under the laws of the state of Texas,

with offices for the practice of law located at 3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas

75219-4281.

4.      As of the date of this Verified Statement, the Firm represents thousands of personal

injury claimants (the "Claimants" or individually "Claimant") who have been injured by asbestos

products manufactured, marketed, distributed, sold, or produced by Debtor and others, and thus hold

claims against, *inter alia*, the Debtor.

5.      Pursuant to the Court's Order this Statement is filed without the exhibits, which are

being provided in CD format to the Clerk of the Court, counsel for the Debtor and the United States

Trustee.  The exhibits consist of (a) blank, but unredacted, exemplars, of each form of agreement or

08629.0001 Houston-144881.1

instrument whereby the Firm is empowered to act on behalf of Claimants, and (b) an Excel spreadsheet in electronic format containing the following data: the name and address of each Claimant, a space reserved for the social security number, the identification of the exemplars, the amount of each liquidated claim or indication that the claim is unliquidated, the date of acquisition of the claim, the type of disease giving rise to the claim, and the pertinent facts related to employment of the Firm.

6.    The nature of the claim held by each Claimant is a personal injury tort claim for damages caused by asbestos products manufactured by the Debtor.

7.    Since the Claimants were exposed to asbestos products manufactured by the Debtor more than one year prior to the filing of the above-captioned bankruptcy case, each of the Claimants may have "acquired" his or her claim more than one year prior to the filing of this bankruptcy case. The Claimants affirmatively assert that the statutes of limitations applicable to their claims did not begin to run on the date of exposure and reserve all procedural and substantive rights pertaining to their claims.

8.    The Claimants are represented by the Firm under a fee agreement which is subject to the attorney-client privilege.  The Firm holds each such instrument as executed between the parties.

9.    The Firm does not hold any claims against or interests in the Debtor, excepting what some could characterize as a beneficial interest (a contingent fee) in certain claims, settlements and/or judgments for asbestos personal injuries of some of the Firm's clients.

10.    The filing of the Firm's Verified Statement does not waive any rights including (i) the Claimants' rights to have final orders in non-core matters entered only after *de novo* review by a district judge; (ii) the Claimants' rights to trial by jury in any proceeding and any trial on their

claims, (iii) the Claimants' rights to have the reference withdrawn by the District court in any matter subject to mandatory or discretionary withdrawal or abstention to the extent not previously directed; (iv) the Claimants' rights in not submitting themselves to the jurisdiction of the Bankruptcy Court; or (v) any other rights, claims, actions, defenses, reclamations, setoffs, or recoupments to which the Claimants are or may be entitled under any agreements, in law or in equity, all of which rights, claims, actions, defenses, reclamations, setoffs, and recoupments the Firm's Claimants expressly reserve.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 17, 2004, at Dallas, Texas.

Alan B. Rich, Esq.

BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
(214) 521-3605 Telephone
(214) 520-1181 Facsimile

Exhibit 4

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY, | ) | Case No. 04-11300-JKF |
| | ) | And all related actions |
| Debtors. | ) | |
| | ) | |

## VERIFIED STATEMENT OF SILBER PEARLMAN, LLP
## UNDER BANKRUPTCY RULE 2019

I, Michael J. Hanners, a representative of Silber Pearlman, LLP, declare as follows:

1.    I am an associate of the law firm of Silber Pearlman, LLP (hereinafter the "Firm"). I am a member in good standing of the bar of the state of Texas.

2.    I have personal knowledge of the facts set forth herein. I make this Verified Statement ("Statement") pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure and the Court's Order of October 22, 2004.

3.    The Firm is a professional corporation organized under the laws of the state of Texas, with offices for the practice of law located at 2711 N. Haskell Ave., 5th Floor, Dallas, Texas 75204-2911.

4.    As of the date of this Verified Statement, the Firm represents thousands of personal injury claimants (the "Claimants" or individually "Claimant") who have been injured by asbestos products manufactured, marketed, distributed, sold, or produced by Debtor and others, and thus hold claims against, *inter alia*, the Debtor.

5.    Pursuant to the Court's Order this Statement is filed without the exhibits, which are being provided in CD format to the Clerk of the Court, counsel for the Debtor and the United States

Trustee. The exhibits consist of (a) blank, but unredacted, exemplars, of each form of agreement or instrument whereby the Firm is empowered to act on behalf of Claimants, and (b) an Excel spreadsheet in electronic format containing the following data: the name and address of each Claimant, a space reserved for the social security number, the identification of the exemplars, the amount of each liquidated claim or indication that the claim is unliquidated, the date of acquisition of the claim, the type of disease giving rise to the claim, and the pertinent facts related to employment of the Firm.

6.    The nature of the claim held by each Claimant is a personal injury tort claim for damages caused by asbestos products manufactured by the Debtor.

7.    Since the Claimants were exposed to asbestos products manufactured by the Debtor more than one year prior to the filing of the above-captioned bankruptcy case, each of the Claimants may have "acquired" his or her claim more than one year prior to the filing of this bankruptcy case. The Claimants affirmatively assert that the statutes of limitations applicable to their claims did not begin to run on the date of exposure and reserve all procedural and substantive rights pertaining to their claims.

8.    The Claimants are represented by the Firm under a fee agreement which is subject to the attorney-client privilege. The Firm holds each such instrument as executed between the parties.

9.    The Firm does not hold any claims against or interests in the Debtor, excepting what some could characterize as a beneficial interest (a contingent fee) in certain claims, settlements and/or judgments for asbestos personal injuries of some of the Firm's clients.

10.    The filing of the Firm's Verified Statement does not waive any rights including (i) the Claimants' rights to have final orders in non-core matters entered only after *de novo* review by

**VERIFIED STATEMENT OF SILBER PEARLMAN, LLP UNDER BANKRUPTCY RULE 2019** - Page 2
17DEC2004 / 5005466.1A

a district judge; (ii) the Claimants' rights to trial by jury in any proceeding and any trial on their claims, (iii) the Claimants' rights to have the reference withdrawn by the District court in any matter subject to mandatory or discretionary withdrawal or abstention to the extent not previously directed; (iv) the Claimants' rights in not submitting themselves to the jurisdiction of the Bankruptcy Court; or (v) any other rights, claims, actions, defenses, reclamations, setoffs, or recoupments to which the Claimants are or may be entitled under any agreements, in law or in equity, all of which rights, claims, actions, defenses, reclamations, setoffs, and recoupments the Firm's Claimants expressly reserve.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 17, 2004, at Dallas, Texas.

**SILBER PEARLMAN, LLP**

By: _____
Michael J. Hanners

Cityplace Center East – 5th Floor
2711 N. Haskell Ave., LB 32
Dallas, TX 75204-2911
214-874-7000
214-824-8100 fax

ATTORNEYS FOR CERTAIN ASBESTOS PLAINTIFFS

STATE OF T E X A S        §
                          §    KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF DALLAS          §

Before me, the undersigned authority, on this day personally appeared Michael J. Hanners,

known to me to be the person whose name is subscribed to the foregoing instrument and

acknowledged to me that he executed the same for the purposes therein expressed.

Given under my hand and seal of office this 17th day of December, 2004.



_____
Notary Public in and for the State of Texas

_____
Printed or Typed Name of Notary

My Commission expires:

6-17-06
_____

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| THE FLINTKOTE COMPANY, | ) | Case No. 04-11300-JKF |
|  | ) | And all related actions |
| Debtors. | ) |  |
|  | ) |  |

### NOTICE OF FILING VERIFIED STATEMENT
### UNDER BANKRUPTCY RULE 2019

PLEASE TAKE NOTICE that on December 17, 2004, the Verified Statement of Silber

Pearlman, LLP  Under Bankruptcy Rule 2019 was filed pursuant to the Court's Order of October

22, 2004.  Exhibits have not been scanned but may be accessed by parties who obtain Court order

authorizing access.

On December 17, 2004, true copies of this Notice were served by United States mail, postage

prepaid, upon the parties on the Official Service List.

DATED:  December 17, 2004.

**SILBER PEARLMAN, LLP**


By:  _____
Michael J. Hanners

Cityplace Center East – 5th Floor
2711 N. Haskell Ave., LB 32
Dallas, TX  75204-2911
214-874-7000
214-824-8100 fax

ATTORNEYS FOR CERTAIN ASBESTOS PLAINTIFFS

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                    )
                                          )    Chapter 11
THE FLINTKOTE COMPANY,                    )
                                          )    Case No. 04-11300-JKF
        Debtors.                          )    And all related actions
                                          )

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of SILBER PEARLMAN, LLP's

Notice of Filing Verified Statement Under Bankruptcy Rule 2019 was served on all parties of the

official service list in this matter. Due to the voluminous nature of the service list, this office has

not attached a copy of the service list hereto, however, will make copies available to any party upon

request. Said service was completed via United States First Class Mail, postage prepaid, on this 17th

day of December, 2004.

**SILBER PEARLMAN, LLP**

By: _____
        Michael J. Hanners

        Cityplace Center East – 5th Floor
        2711 N. Haskell Ave., LB 32
        Dallas, TX  75204-2911
        214-874-7000
        214-824-8100 fax

        ATTORNEYS FOR CERTAIN ASBESTOS PLAINTIFFS

Exhibit 5

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------x
                                        :    Chapter 11
IN RE                                   :
                                        :    Case Nos. 00-3837 to 3854 (JKF)
                                        :    (Jointly Administered)
                                        :
OWENS CORNING, et al.                   :
                                        :
              Debtors.                  :    Related to Dkt. No. 13402
                                        :
-------------------------------------------------x
```

**ORDER GRANTING MOTION OF CREDIT SUISSE**
**FIRST BOSTON, AS AGENT, FOR ACCESS TO EXAMINE**
**STATEMENTS FILED PURSUANT TO BANKRUPTCY RULE 2019(a)**

Upon consideration of the motion (Dkt. No. 13402) (the "Motion") of Credit

Suisse First Boston ("CSFB"), as agent for the prepetition institutional lenders to Owens Corning

and certain of its affiliates, dated November 22, 2004 for, pursuant to section 107(a) of title 11 of

the United States Code and rules 7026, 7034 and 9014 of the Federal Rules of Bankruptcy

Procedure, access to examine statements (the "Rule 2019 Statements") filed with the Clerk of the

Court and served upon Owens Corning pursuant to order of this Court and rule 2019(a) of the

Federal Rules of Bankruptcy Procedure by all entities representing more than one creditor or

equity security holder in the chapter 11 cases of Owens Corning and its affiliated debtors

(collectively, the "Debtors"); and it appearing that due and proper notice of the Motion has been

given by CSFB; and it further appearing that the Court has jurisdiction to consider and determine

the Motion pursuant to 28 U.S.C. § 1334; and a joinder (the "Joinder") in support of the Motion

having been filed by Century Indemnity Company, as successor to CCI Insurance Company, as

successor to Insurance Company of North America, and Central National Insurance Company

(collectively, "Century") (Dkt. No. 13642) on December 14, 2004; and it further appearing that

an objection (the "Objection") to the Motion was interposed by the Debtors (Dkt. No. 13621) on

December 10, 2004; and the Court having held a hearing on December 20, 2004 (the "Hearing") to consider the Motion, the Joinder and the Objection, during which time oral arguments of counsel were presented; and, upon due consideration of the Motion, the Joinder, the Objection and the presentations made at the Hearing, it is hereby:

ORDERED that the Motion is hereby granted, as described below; and it is further

ORDERED that within 5 days from the entry of this order, CSFB and Century shall cause the notice attached hereto as Exhibit A to be served by first-class mail upon all entities who have filed a Rule 2019 Statement in these chapter 11 cases through the date of this Order; and it is further

ORDERED that the Debtors shall permit immediate access by CSFB and/or Century (and their respective agents) to copy the compact disks in their possession containing the Rule 2019 Statements; and it is further

ORDERED that CSFB and Century (and their respective agents) shall keep the specific information contained in the Rule 2019 Statements confidential, pending further order of the Court, provided, however, that nothing in this Order shall be deemed to prohibit the use of the information contained in the 2019 Statements on an aggregate basis in connection with the estimation proceeding currently scheduled to commence in the district court on January 13, 2005 (the "Estimation Hearing"), provided further, however, that nothing in this Order shall preclude any party from objecting at the Estimation Hearing to the admissibility of such information.

Dated: January __11__, 2005

*Judith K. Fitzgerald*
rmab

_____
United States Bankruptcy Judge

2

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------x
                                                  :   Chapter 11
IN RE                                             :
                                                  :   Case Nos. 00-3837 to 3854 (JKF)
                                                  :   (Jointly Administered)
OWENS CORNING, et al.                             :
                                                  :
                        Debtors.                  :
                                                  :
--------------------------------------------------x
```

**NOTICE OF ACCESS TO EXAMINE**
**AND COPY RULE 2019 STATEMENTS**

       **PLEASE TAKE NOTICE** that on November 22, 2004, Credit Suisse First Boston ("CSFB"), as agent for the prepetition institutional lenders to Owens Corning and certain of its affiliates, filed a motion (Dkt. No. 13402) (the "Motion") for, pursuant to section 107(a) of title 11 of the United States Code and rules 7026, 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, access to examine statements (the "Rule 2019 Statements") filed with the Clerk of the Court and served upon Owens Corning pursuant to order of this Court and rule 2019(a) of the Federal Rules of Bankruptcy Procedure by all entities representing more than one creditor or equity security holder in the chapter 11 cases of Owens Corning and its affiliated debtors (collectively, the "Debtors").

       **PLEASE TAKE FURTHER NOTICE** that on December 14, 2004, Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, and Central National Insurance Company (collectively, "Century") filed a joinder (the "Joinder") in support of the Motion.

       **PLEASE TAKE FURTHER NOTICE** that pursuant to order dated January __, 2005, the Bankruptcy Court granted the Motion and has authorized CSFB and Century to examine and copy the Rule 2019 Statements.

**PLEASE TAKE FURTHER NOTICE** that CSFB and Century are required by order of the Bankruptcy Court to keep the individual information contained in the Rule 2019 Statements confidential, pending further order.

Dated: January 6, 2005                    LANDIS RATH & COBB LLP

                                          _____

                                          Richard S. Cobb (I.D. No. 3157)
                                          Rebecca L. Butcher (I.D. No. 3816)
                                          919 Market Street, Suite 600
                                          Wilmington, DE 19810
                                          Telephone: (302) 467-4400
                                          Facsimile: (302) 467-4450

                                                -and-

                                          WEIL, GOTSHAL & MANGES LLP

                                          Martin J. Bienenstock
                                          Richard Rothman
                                          767 Fifth Avenue
                                          New York, NY 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                                -and-

                                          KRAMER LEVIN NAFTALIS & FRANKEL
                                          LLP

                                          Kenneth H. Eckstein
                                          Ellen R. Nadler
                                          Gary M. Becker
                                          919 Third Avenue
                                          New York, New York 10022
                                          (212) 715-9100 (telephone)
                                          (212) 715-8000 (telecopy)

                                          Attorneys for Credit Suisse First Boston, as
                                          Agent for the Banks

Exhibit 6

Westlaw.

2005 WL 563890                                                                                    Page 1
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Fourth Circuit.
In Re: URBAN BROADCASTING
CORPORATION, Debtor.
Theodore M. White, Appellant,
v.
Univision Of Virginia Incorporated, Appellee,
Stanley M. Salus, Trustee-Appellee,
and
U.S. Trustee, Party-in-interest.
**No. 04-1262.**

Argued: Feb. 2, 2005.
Decided: March 11, 2005.

**Background:** Order was entered by the United States Bankruptcy Court for the Eastern District of Virginia allowing creditor's proof of claim and authorizing distribution thereon. Corporate Chapter 7 debtor's majority shareholder appealed. The District Court, Thomas Selby Ellis, III, J., 304 B.R. 263, entered order dismissing appeal, and shareholder again appealed.

**Holdings:** The Court of Appeals, Niemeyer, Circuit Judge, held that:
(1) 55% percent equity holder in Chapter 7 debtor-corporation, who would have received same distribution from out of excess funds in debtor's surplus estate regardless of whether other equity holder received distribution on his 45% interest in his capacity as equity holder or as creditor to whom debtor was indebted under put/call agreement, was not "aggrieved" by, and had no standing to appeal, bankruptcy court order allowing proof of claim filed by this other equity holder pursuant to put/call agreement; and
(2) equity holder's failure to object to proof of claim filed against corporate debtor's Chapter 7 estate, or to attend hearing to determine whether this claim should be allowed, despite having been

served with bankruptcy court order establishing bar date for objecting to claim, which clearly advised equity holder that he had to object or be "forever barred" from raising any objection, was waiver or forfeiture of his right to challenge order on appeal.
Affirmed.

**[1] Bankruptcy** ☞3771
51k3771 Most Cited Cases
In order to have standing to appeal bankruptcy court's order to district court, appellant must be a person aggrieved by the order.

**[2] Bankruptcy** ☞3771
51k3771 Most Cited Cases
To qualify as "person aggrieved" by bankruptcy court's order, with standing to appeal therefrom, party must be directly and adversely affected pecuniarily by order.

**[3] Bankruptcy** ☞3771
51k3771 Most Cited Cases
Whether equity holder had objected to proof of claim or attended hearing to determine whether claim should be allowed had no bearing on whether he had standing to appeal bankruptcy court order allowing this claim; while his lack of objection and failure to attend hearing may have resulted in waiver or forfeiture of any objection that he had, his appellate standing was separate issue, that depended solely on whether order directly and adversely affected his pecuniary interests.

**[4] Bankruptcy** ☞3771
51k3771 Most Cited Cases
Fifty-five percent equity holder in Chapter 7 debtor-corporation, who would have received same distribution from out of excess funds in debtor's surplus estate regardless of whether other equity holder received distribution on his 45% interest in his capacity as equity holder or as creditor to whom debtor was indebted under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

put/call agreement, was not "aggrieved" by, and had no standing to appeal, bankruptcy court order allowing proof of claim filed by this other equity holder pursuant to put/call agreement, despite his unsubstantiated contention that bankruptcy court order authorizing distribution to equity holder in his capacity as creditor would have greater res judicata effect in any subsequent litigation between parties.

**[5] Bankruptcy** ☞3770
51k3770 Most Cited Cases
Equity holder's failure to object to proof of claim filed against corporate debtor's Chapter 7 estate, or to attend hearing to determine whether this claim should be allowed, despite having been served with bankruptcy court order establishing bar date for objecting to claim, which clearly advised equity holder that he had to object or be "forever barred" from raising any objection, was waiver or forfeiture of his right to challenge order allowing claim on appeal.

**[6] Bankruptcy** ☞3768
51k3768 Most Cited Cases

**[6] Bankruptcy** ☞3771
51k3771 Most Cited Cases
Bankruptcy court orders refusing to extend deadline for equity holder to object to proof of claim filed against corporate debtor's Chapter 7 estate and denying equity holder's motion for reconsideration were interlocutory orders, that were not appealable in their own right, and that could not be reviewed after bankruptcy court entered order allowing this proof of claim, given that equity holder was not person aggrieved by claims allowance order.

**[7] Bankruptcy** ☞3767
51k3767 Most Cited Cases
Although concept of finality, for purposes of appeal, has traditionally been applied in more pragmatic and less technical way in bankruptcy cases than in other contexts, bankruptcy court order must nonetheless conclusively determine

a separable dispute in order to be immediately appealable as "final order."

**[8] Bankruptcy** ☞3768
51k3768 Most Cited Cases
Under "collateral order" doctrine, interlocutory orders of bankruptcy court are appealable if they conclusively determine a disputed question, resolve an important issue completely separate from merits of action, and are effectively unreviewable on appeal from final judgment.

**ARGUED:** Andrew James Toland, III, William H. Murphy, Jr., William H. Murphy, Jr. & Associates, P.A., Baltimore, Maryland, for Appellant. Evan McGuire Jones, O'Melveny & Myers, L.L.P., Los Angeles, California, for Appellee Univision of Virginia, Inc. **ON BRIEF:** Austin K. Barron, Gabriel S. Dermer, O'Melveny & Myers, L.L.P., Los Angeles, California, for Appellee Univision of Virginia, Inc.

Before NIEMEYER, MICHAEL, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Judge DUNCAN joined.

**OPINION**
NIEMEYER, Circuit Judge:

**\*1** In this Chapter 7 bankruptcy of Urban Broadcasting Corporation ("UBC"), Univision of Virginia, Inc. ("Univision"), a 45% owner of UBC's stock, filed a claim to require UBC to buy its 45% equity interest in accordance with a put/call agreement between it and UBC. Because the bankruptcy estate had approximately $17.5 million in it after all creditors, except Univision, had been paid, Univision's shares were worth about $7.86 million. Allowing Univision's claim as a creditor under the put/call agreement therefore would yield Univision the same amount that it would receive if its claim were disallowed and it were paid as a 45% equity owner of UBC.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 563890                                                                                           Page 3
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

The bankruptcy court conducted a hearing on Univision's claim on July 22, 2003. Theodore White, the owner of the remaining 55% of the shares of UBC, did not attend the hearing, nor did he submit any objection, despite the bankruptcy court's order that he file any objection by July 3, 2003, or "be forever barred." Following the hearing, the court allowed Univision's claim *as a creditor* under the put/call agreement and authorized distribution of $7.86 million to Univision and the remaining distributable amount of $8.85 million (net of administrative expenses) to White.

White appealed the bankruptcy court's July 22 allowance order, as well as two procedural orders relating to the July 22 allowance order, to the district court. With respect to the allowance order, White contended that Univision should have received the $7.86 million not as a *creditor,* but rather as a *shareholder* of UBC. Even though there would be no difference in the amount of distribution, White argued that a distribution to Univision as a creditor would have a greater *res judicata* effect in any subsequent court proceeding and thus would affect him adversely. White expressly told the court that he was intending to file a separate suit against Univision after the bankruptcy proceedings were completed.

On Univision's motion, the district court dismissed White's appeal on the ground that he had no standing to challenge the bankruptcy court's order because he "failed to file an objection to the claim despite the bankruptcy court's order to do so by July 3 'or be forever barred' " and also because he "failed to appear and object at the July 22 bankruptcy court hearing regarding Univision's claim." The court ruled alternatively:

Even assuming *arguendo* that White had standing to appeal, however, White's failure to object despite specific direction by the bankruptcy court to do so is a "voluntary and

intentional" relinquishment of his objection and hence a waiver. As a consequence, White is barred from attacking Univision's claim and allowance order.

**\*2** Although our reasoning differs somewhat from that advanced by the district court, we affirm the district court's judgment on the grounds that (1) White was not "a person aggrieved" by the bankruptcy court's order, as the term "person aggrieved" is used to justify standing to appeal a bankruptcy order, and (2) in any event, White waived or forfeited the right to challenge the bankruptcy court's July 22 order by failing to comply with the bankruptcy court's June 5, 2003 order to file such a claim or "be forever barred" from doing so. In view of these conclusions, we also conclude that the bankruptcy court's procedural orders were interlocutory and therefore not appealable to the district court.

I

Theodore White and Silver King Broadcasting of Virginia, Inc. ("Silver King") formed UBC in 1989 to operate a Home Shopping Network-affiliated television station in the Washington, D.C. area. In exchange for financing the initial construction of the station, Silver King received a 45% equity stake in UBC, and White, who was to serve as UBC's CEO and general manager, received the remaining 55%. White and Silver King also entered into a "Right of First Refusal and Put and Call Agreement." Under the terms of that agreement, Silver King had a right to require UBC to purchase its shares on the occurrence of certain triggering events (a "put"), including UBC's default on any loan agreements, UBC's failure to affiliate with the Home Shopping Network, and UBC's failure to perform its obligations under such an affiliation agreement. White had a "call" option on Silver King's shares, which gave him the right to purchase Silver King's stock in the event that Home Shopping Network defaulted on its compensation payments

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 563890                                                                                    Page 4
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

to UBC under an affiliation agreement.

Shortly after signing the put/call agreement, Silver King changed its name to HSN Broadcasting of Virginia, Inc., and the put/call agreement was amended accordingly. Later, HSN Broadcasting of Virginia, Inc., became, by another name change, USA Station Group of Virginia, Inc. Yet later, USA Station Group of Virginia, Inc., was among the entities purchased by Univision Communications, Inc., and became Univision of Virginia, Inc. ("Univision"), the claimant in this case.

Almost from the beginning, UBC was marred by fighting between its equity owners and by problems with its affiliation agreement with Home Shopping Network. Construction-related disputes between the owners of UBC led UBC to file its first Chapter 11 bankruptcy in 1995, and shortly after UBC emerged from bankruptcy in 1996, litigation ensued in Virginia state court between UBC and Home Shopping Network when Home Shopping Network discontinued its affiliation payments to UBC. Both UBC and Home Shopping Network asserted that the other was in breach of their affiliation agreement, but Home Shopping Network ultimately prevailed, obtaining a declaratory judgment that it had not breached the agreement.

Because UBC was no longer receiving affiliation payments from Home Shopping Network, it was forced to file a second Chapter 11 bankruptcy proceeding in August 2000--the bankruptcy that is at issue in this appeal. USA Station Group of Virginia (formerly Silver King) filed a motion to appoint a Chapter 11 trustee. To avoid the appointment of a trustee, however, UBC agreed to sell substantially all of its assets. The bankruptcy court conducted an auction in April 2001, and Univision Communications, Inc., was the highest bidder for the assets at $60 million. About that same time, Univision Communications, Inc., also completed its acquisition of USA Networks, Inc.'s

broadcast television subsidiaries, and USA Station Group of Virginia, Inc., thereby became Univision of Virginia, Inc. ("Univision"). Thus, Univision became the presumptive successor-in-interest to Silver King's 45% equity stake in UBC and the put/call agreement that White and UBC originally entered into with Silver King.

**\*3** During the course of UBC's Chapter 11 proceeding, Univision, as 45% owner of UBC, filed a proof of claim based on the put/call agreement, contending that triggering events had occurred and that UBC was therefore required to buy its 45% interest in UBC. UBC objected to the claim, primarily disputing Univision's asserted status as a successor in interest to the put/call agreement.

Concerned with White's control of the bankruptcy estate, the bankruptcy court appointed Stanley M. Salus as Chapter 11 trustee on December 19, 2001. The court concluded that "given the debtor's failure to propose a confirmable plan, the best way at this point of getting creditors paid is ... to appoint a Chapter 11 trustee in this case." Salus thereafter proceeded to pay all claims against UBC--except Univision's claim based on the put/call agreement--using the $60 million in proceeds from the asset sale. On August 23, 2002, the case was converted into a Chapter 7 proceeding.

After the trustee paid the claims against UBC, approximately $17.5 million remained in the bankruptcy estate for distribution to UBC's equity holders-- White and Univision. Accordingly, the trustee filed a motion for interim distribution of these funds in April 2003, proposing to distribute 55% to White and 45% to Univision. Univision, however, objected, contending that it had an unresolved claim as a creditor under the terms of the put/call agreement. Even though Univision would receive the identical amount as a creditor under the put/call agreement in payment of its 45% equity interest as it would receive directly as

2005 WL 563890                                                                    Page 5
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

a 45% equity holder, Univision was motivated by a desire to avoid any additional litigation with White. Univision apparently expected that payment to it as a creditor would have a stronger *res judicata* effect in anticipated post-bankruptcy litigation with White than would payment to it as a shareholder.

The bankruptcy court held a hearing on the trustee's motion for interim distribution on June 3, 2003, and concluded that Univision's proof of claim had to be resolved prior to any distribution to equity holders. The bankruptcy court accordingly entered an order dated June 5, 2003, in which it substituted the trustee for the debtor-in-possession with respect to UBC's objection to Univision's claim, but clarified that "[n]othing in this order, however, requires the trustee to prosecute the objection if there would be no economic benefit to the bankruptcy estate in doing so." The order also scheduled a hearing for July 22, 2003, and explicitly warned White that "any objection by [him] to the allowance of Univision's claim must be filed by *July 3, 2003,* or be forever barred." Even though White elected not to be present at the June 3 hearing, he was served with a copy of the June 5 order both by Univision and by the bankruptcy court clerk.

In response to the bankruptcy court's June 5 order, White filed a motion on June 30, 2003, to extend the deadline for objecting to Univision's claim; to postpone the hearing date; and to authorize the trustee to make a partial distribution to him to retain counsel for prosecuting an objection to Univision's claim. White also requested expedited hearing of his motion. The next day, July 1, the bankruptcy court denied the motion for extension of time to file an objection and to postpone the hearing, denied White's motion for expedited hearing, and stated that White's motion seeking authority for the trustee to make a partial distribution could be scheduled on any regularly scheduled motions day providing adequate notice.

The court explained its denial of White's procedural motions as follows:

**\*4** The simple fact of the matter is that this case has been before the court for an inordinately long period of time and that most of the delay in the administration of the case has been the fault of Mr. White. For him to wait until the last moment to attempt to bring new counsel on board and then to cite his own procrastination as the basis for a continuance is unacceptable.

White then filed a motion on July 3, 2003, for reconsideration of the bankruptcy court's order, which he characterized as an order "denying application to employ Bean, Kenney & Korman as counsel." This motion focused on White's claimed lack of funds to retain proper counsel to represent his interests before the bankruptcy court. (White's appellate counsel acknowledged during oral argument that Bean, Kenney & Korman had refused White further representation after not having been paid.)

On July 18, 2003, four days before the scheduled July 22 hearing, the trustee filed a memorandum informing the bankruptcy court and the parties that he did not intend to object to Univision's claim at the hearing. He explained that since "Univision would be compensated the identical amount whether as a creditor or as a shareholder" and since "prosecution of [UBC's] objection on any viable basis would necessarily entail potentially lengthy discovery regarding the underlying facts, as well as research, briefing and trial on the facts and related legal issues, with the estate incurring concomitant fees and expenses," there would be no purpose nor any economic benefit to be gained by prosecution of the objection.

On July 22, 2003, the hearing proceeded as scheduled, but White elected not to attend. The court began the hearing by denying White's motion for reconsideration, noting that White "did not need the approval of this court to employ

2005 WL 563890                                                                                          Page 6
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

counsel to represent his interest as a shareholder" and that the motion was never noticed for a hearing. Following the hearing, the bankruptcy court entered three orders, one formally denying White's motion for reconsideration; one allowing Univision's claim in the amount of $7,861,530; and one authorizing an interim distribution of $8,850,000 to UBC, which was now 100%-owned by White in view of Univision's put of its shares to UBC.

After White appealed the bankruptcy court's orders to the district court, Univision filed a motion to dismiss, which the district court granted. *See White v. Univision of Va. (In re Urban Broadcasting Corp.), 304 B.R. 263 (E.D.Va.2004).* Noting that White was appealing three orders--the July 1 order denying his motion to extend the objection deadline, postpone the hearing, and authorize partial distribution; the July 22 order denying his motion for reconsideration; and the July 22 order allowing Univision's claim--the district court held that the July 1 order and the first July 22 order were interlocutory. *Id.* at 269. Only if White had standing to appeal the July 22 order allowing Univision's claim, the final order into which the two interlocutory orders merged, could the interlocutory orders properly be considered on appeal. *Id.* at 270. The district court then concluded that White was not a "person aggrieved" and therefore had no standing to appeal the bankruptcy court's July 22 order allowing Univision's claim because (1) White failed to file an objection after being warned that failure to do so would result in any objections being "forever barred," and (2) White failed to appear and object to the claim at the July 22, 2003 hearing. *Id.* at 270-71. The court held alternatively that White's "failure to object despite specific direction by the bankruptcy court to do so is a 'voluntary and intentional' relinquishment of his objection and hence a waiver. As a consequence, White is barred from attacking Univision's claim and the Allowance Order." *Id.* at 273.

**\*5** From the district court's order, dated January 28, 2004, White appealed, making two arguments. First, he contends that he does have standing to appeal from the order allowing Univision's claim and authorizing an interim distribution because he is a "person aggrieved," a status that does not require him to have appeared and objected at the July 22 hearing. Second, he contends that, in any event, he has standing to appeal the bankruptcy court's interlocutory orders--the July 1 order and the first July 22 order--because he has "timely appealed from [these] 'final' orders."

II

White's principal argument on appeal is that the district court erred in concluding that he was not a "person aggrieved" by the bankruptcy court's order allowing Univision's claim on the ground that he did not file an objection to or attend the hearing on the claim. He argues that his standing to appeal is not related to whether he objected to the claim or attended the hearing, but rather on whether the bankruptcy court's order "directly and adversely affected [his] pecuniary interests." And to fulfill this requirement for standing, he asserts in his brief on appeal:

> If Univision's claim were denied in its entirety, then White would have been entitled to 100% of the surplus proceeds in the Chapter 7 estate. Similarly, if the bankruptcy court determined that White had exercised "call" and acquired all of Silver King/Univision's stock in UBC, then Univision's "put" claim would have been rendered a nullity and White would have held 100% of UBC's stock; even if all the surplus proceeds were returned to UBC, White would have been the beneficial recipient of all of the $15 million being disbursed because he would then be the sole shareholder of the company.

Thus, while White and the district court both recognize that White's right to appeal depends on whether he was a "person aggrieved" by the bankruptcy court's order, they disagree on the relevance of whether White filed an objection to

2005 WL 563890                                                                    Page 7
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

the claim or attended the hearing.

**\*6** The district court concluded that White was not a "person aggrieved" on two distinct bases. *First,* it stated that given White's failure to object to Univision's claim and "the clarity of the bankruptcy court's June 5 order," White's objection has been 'forever barred,' and thus he is not a 'person aggrieved' ... with regard to the July 22 Allowance Order and does not meet the standard governing standing to appeal." *White,* 304 B.R. at 270-71 (footnote omitted). "A contrary conclusion," the district court continued, "would render bankruptcy court orders meaningless and imperil the integrity of the bankruptcy process." *Id.* at 271. *Second,* the district court relied on cases from other circuits and concluded that the Fourth Circuit would likely conclude, "consistent with the Seventh, Ninth, and Tenth Circuits, ... that attendance and objection at the bankruptcy court hearing are pre-requisites to appellate standing" under the "person aggrieved" test. *Id.* at 272. *See, e.g., Weston v. Mann (In re Weston ), 18 F.3d 860, 864 (10th Cir.1994); In re Schultz Mfg. Fabricating Co., 956 F.2d 686, 690 (7th Cir.1992); Brady v. Andrew (In re Comm. W. Fin. Corp.), 761 F.2d 1329, 1335 (9th Cir.1985). But see, e.g., Int'l Trade Administration v. Rensselaer Polytechnic Inst., 936 F.2d 744, 748 (2d Cir.1991)* (holding that a "person aggrieved" has standing to appeal whether or not that person sought intervention); *Maynard Savs. Bank v. Michels (In re Michels ), 286 B.R. 684, 690 (B.A.P. 8th Cir.2002)* (concluding that a creditor had standing to appeal a confirmation order even though it failed to file a timely proof of claim); *Johnson v. E.C. Ernst, Inc. (In re Ernst, Inc. ), 2 B.R. 757, 761 (S.D.N.Y. 1980)* (recognizing that the now-repealed Bankruptcy Act provision that originated the "person aggrieved" standard did not include any appearance requirement). The district court in this case reasoned in light of these cases that, because White failed to appear at the July 22, 2003 bankruptcy court hearing and to object to

Univision's claim, he lacked standing to appeal.

[1][2] The test for standing to appeal a bankruptcy court's order to the district court is well-established: the appellant must be a *person aggrieved* by the bankruptcy order. *See U.S. Trustee v. Clark (In re Clark ), 927 F.2d 793, 795 (4th Cir.1991).* Likewise, it is well-established that a person aggrieved is "a party 'directly and adversely affected pecuniarily.' " *Id.* (quoting *Fondiller v. Robertson (In re Fondiller ), 707 F.2d 441, 442 (9th Cir.1983)).*

[3] We conclude that defining standing by whether a party waives or forfeits rights to object to claims, as did the district court, misconstrues the standing requirement as we have defined it, i.e., that the appellant show that he has been *directly and adversely affected pecuniarily* by the bankruptcy order. Moreover, defining standing by whether an appellant has objected to an order or attended a hearing conflates basic notions of standing with notions of waiver and forfeiture. Accordingly, we adhere to the formulation of standing articulated in *Clark* and, in this case, ask only whether White was directly and adversely affected pecuniarily by the bankruptcy court's order.

**\*7** [4] Up to this point in the analysis, therefore, we agree with White's position. The difficulty for White hereafter, however, is that he has failed to demonstrate that the bankruptcy court's order allowing Univision's claim directly and adversely affected his pecuniary interests.

Under the bankruptcy court's order, White would receive 55% of the $17.5 million in the bankruptcy estate, regardless of whether Univision is paid its 45% as a creditor under the put/call agreement or whether Univision is paid its 45% directly as a shareholder. The trustee chose not to oppose Univision's claim under the put/call agreement precisely because there was no economic difference between the two scenarios.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 563890                                                                      Page 8
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**

Moreover, White himself took the same position before the district court, as manifested in this exchange between his counsel and the court:

THE COURT: Would your client object to the distribution to Univision of 45 percent of the assets as an owner of UBC?

COUNSEL FOR WHITE: He did not.

THE COURT: And wouldn't today?

COUNSEL FOR WHITE: No. He would say that that distribution is subject to litigation, and a recoupment in another matter.

THE COURT: Well, then he would object to it.

COUNSEL FOR WHITE: No.

White's claim--made for the first time on appeal--that he could own 100% of the shares of UBC if he were successful is not only inconsistent with his concession before the district court, but also unsupported by anything in the record. Univision's claim under the put/call agreement requiring UBC to buy back its 45% interest in the stock of UBC was based on UBC's breach of its affiliation agreement with Home Shopping Network, and a Virginia state court has already determined that issue against UBC. Likewise, White's "call" to buy Univision's shares was dependent on Home Shopping Network's default under the affiliation agreement. And again, this issue was resolved against White in state court. On the record before us, there is nothing to support the assertion that White could cut Univision out of any share in UBC.

Without providing a satisfactory response to this economic reality, White advances a second argument to support his claim that he is a "person aggrieved." He claims that the potential *res judicata* effect of the bankruptcy court's July 22, 2003 allowance order is greater than if Univision's claim had not been allowed. According to White, he "faces the very real prospect that Univision will argue in the future that [the bankruptcy court's] orders bar [his] claims against Univision." White, however, never substantiates this

argument. Indeed, the record would reveal that regardless of whether the bankruptcy court ordered distribution to Univision under the put/call agreement or to Univision directly as a shareholder, White would be left with a bankruptcy court adjudication. More precisely, he would be bound by the bankruptcy court's adjudication *either* that Univision was entitled to have its shares purchased by UBC (now the estate) under the put/call agreement for $7.86 million *or* that Univision was entitled to have the estate pay it $7.86 million directly due to the fact that it owned 45% of the shares in UBC. In either case, the bankruptcy court's determination presumably would be binding in later adjudication under principles of *res judicata.*

Without demonstrating how the two determinations would have a different *res judicata* effect that would directly and adversely affect White's pecuniary interests, his *res judicata* argument must fail. Certainly, it is not the responsibility of the district court, nor this court, to predict the *res judicata* effect of its orders on a hypothetical future case. Moreover, even if a court attempted to do so, any such prediction could only be based on rank speculation.

**\*8** Because White failed to demonstrate that he suffered a direct and adverse pecuniary harm as the result of the bankruptcy court's July 22, 2003 allowance order, he was not a "person aggrieved" and therefore did not have standing to appeal the order to the district court.

                                III

[5] In addition to dismissing White's appeal on standing grounds, the district court held that White waived his right to appeal the bankruptcy court's July 22, 2003 allowance order by failing to file an objection to Univision's claim despite the bankruptcy court's clear and unambiguous order to do so by July 3, 2003, or "be forever barred." *White,* 304 B.R. at 270, 273. In its discussion of standing, the district court explained the

importance of enforcing such an order:

> Because White failed to object, the bankruptcy court, when it allowed Univision's claim, was not aware of any objection by White to the claim or of any evidence White might offer in support of an objection. Given this and given the clarity of the bankruptcy court's June 5 order, White's objection has been "forever barred"....

*Id.* at 270.

In his brief on appeal, White does not address this ground advanced by the district court, nor does he challenge the legality of the bankruptcy court's June 5, 2003 order. Accordingly, we are not provided with any reason why White's right to challenge the bankruptcy court's July 22, 2003 allowance order was not waived or forfeited by his failure to comply with the bankruptcy court's June 5 order.

The bankruptcy court's June 5 order was a comprehensive scheduling order entered to administer the disposition of Univision's claim. In the order, the court (1) directed Univision to file an amended proof of claim by June 13, 2003, setting forth the final liquidated amount of its claim; (2) substituted the trustee for UBC on UBC's objection to the claim; (3) directed that White file any objection to the allowance of Univision's claim by July 3, 2003, "or be forever barred"; (4) scheduled a hearing on Univision's claim for July 22, 2003; (5) directed Univision to give notice to the trustee and to White of "the claim objection bar date" and the hearing date; (6) continued the trustee's motion for an interim distribution; and (7) directed the clerk to mail the order to the parties, including White. We cannot conceive of any reason why this order was not an appropriate one for the bankruptcy court to have entered, and White has not suggested any reason why it was not a legal order.

Provision (3) of the order, directing White to file

any objection he might have to the allowance of Univision's claim by July 3 "or be forever barred," was clear and functioned much like any writ of summons that commences an action or proceeding. As was the case with the bankruptcy court's June 5 order, a summons issues from the court; is served on the defendant; states the date by which the defendant must appear and respond; and notifies the defendant that his failure to do so will result in a judgment by default against him. *See, e.g.,* Fed.R.Civ.P. 4(a); *see also* Fed. R. Bankr.P. 7004(a). In this case, rather than promising a default judgment, the bankruptcy court's order stated similarly that White's failure to file his objection would forever preclude his making an objection. Because we have been given no reason why this order should not be enforced and can discern no reason ourselves, we conclude that it was properly enforced according to its terms.

**\*9** Whether such enforcement amounted to a nullification of any pecuniary interest for purposes of standing is not something that we need to decide, because enforcement of the order according to its terms amounted to a waiver or forfeiture of White's right to challenge the order on appeal. *See First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1317 (4th Cir.1996); AMF Bowling Worldwide, Inc. v. Herricks Fore Plan, Inc. (In re AMF Bowling Worldwide, Inc.), 278 B.R. 96, 101 (Bankr.E.D.Va.2002); see also Freytag v. Comm'r, 501 U.S. 868, 894, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)* (Scalia, J., concurring) (noting that "[n]o procedural principle is more familiar to this Court than that a constitutional right may be forfeited in a criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it" (quoting *Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944)*)(internal quotation marks omitted)); *id. at*

894 n. 2, 111 S.Ct. 2631 (Scalia, J., concurring) (noting that "waiver" is probably a subset of "forfeiture" and concluding that "[s]ome rights may be forfeited by means short of waiver").

Accordingly, we agree with the district court's alternative ruling that because the bankruptcy court's June 5, 2003 order clearly and unambiguously directed White to file an objection to Univision's claim by July 3, 2003 or be forever barred and because the order was concededly served on White, his failure to comply with the order amounted to a waiver or forfeiture of his right to challenge the July 22, 2003 order on appeal.

IV

[6] Finally, White contends that, independently of his standing to appeal the allowance order, he should be permitted to appeal the bankruptcy court's July 1, 2003 order denying his motion to extend the objection deadline, to postpone the hearing, and to authorize partial distribution, and the July 22, 2003 order denying his motion to reconsider the July 1 order. The district court concluded that these orders were interlocutory in nature and therefore not appealable absent White's standing to appeal the final July 22 allowance order. *See* 28 U.S.C. § 158(a)(1); *White,* 304 B.R. at 270. We agree.

[7] While "the concept of finality ... has traditionally been applied 'in a more pragmatic and less technical way in bankruptcy cases than in other situations,' " *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1009 (4th Cir.1986) (quoting *In Re Amatex Corp.,* 755 F.2d 1034, 1039 (3d Cir.1985)), to be final, an order must "conclusively determine[ ] a separable dispute over a creditor's claim or priority," *In re Saco Local Dev. Corp.,* 711 F.2d 441, 445-46 (1st Cir.1983); *see also A.H. Robins Co.,* 788 F.2d at 1009 (approvingly citing then-Judge Breyer's characterization of "finality" in *Saco* ). White does not even argue that the procedural orders at

issue qualified under this test. There was no "separable dispute," nor were any of White's rights "conclusively determined." *See Saco,* 711 F.2d at 445-46.

***10** [8] Similarly, the interlocutory orders do not constitute "collateral orders" that would be immediately appealable. Under the collateral order doctrine, interlocutory orders of the bankruptcy court are appealable if they "conclusively determine [a] disputed question, resolve an important issue completely separate from the merits of [an] action, and [are] effectively unreviewable on appeal from a final judgment." *Grundy Nat'l Bank v. Looney (In re Looney* ), 823 F.2d 788, 791 (4th Cir.1987) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (internal quotation marks omitted). Again, White does not even contend that these interlocutory orders meet this test, and they surely do not. The interlocutory orders determined nothing conclusively, and were White to have standing to appeal the bankruptcy court's final allowance order, such an appeal would effectively review the interlocutory orders as well.

In this regard, we should add that the bankruptcy court did not deny partial distribution to White; it merely denied expedited hearing of the motion and noted that the motion could be set on any regularly scheduled motions day providing adequate notice.

Thus, we agree with the district court that the interlocutory orders challenged by White would only be appealable as part of an appeal of the July 22 allowance order--the final order of the bankruptcy court into which the interlocutory orders merged. But since we have found that White was not entitled to appeal the July 22 allowance order, so too do we conclude that he was not entitled to appeal the interlocutory orders that merged into it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 563890                                                                                    Page 11
--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))
**(Cite as: 2005 WL 563890 (4th Cir.(Va.)))**


Accordingly, we affirm the district court's order dismissing White's appeal of the bankruptcy court's orders dated July 1 and July 22, 2003.

*AFFIRMED*

--- F.3d ----, 2005 WL 563890 (4th Cir.(Va.))

**Briefs and Other Related Documents (Back to top)**

. 04-1262 (Docket) (Mar. 04, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.